# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   **Plaintiff,**

 v.                    **Case No. 06-CR-336**

**JONATHAN COLLA**
   **Defendant.**

## SENTENCING MEMORANDUM

   The government obtained an order permitting the interception of calls to and from the telephone of Javier Aguilera, a suspected large-scale cocaine distributor. Pursuant to the wiretap, the government learned that Aguilera dealt cocaine to various customers, including defendant Jonathan Colla. Agents arrested defendant, and he admitted regularly obtaining cocaine from Aguilera for several months, mainly for personal use. Defendant eventually pleaded guilty to use of a telephone to facilitate a drug trafficking offense, contrary to 21 U.S.C. § 843(b), and I ordered a pre-sentence report ("PSR") and set the case for sentencing.

   The PSR, adopting the government's recommendation, set a base offense level consistent with the total amount of cocaine defendant obtained from Aguilera. Defendant objected, arguing that amounts he obtained for personal use should be excluded. In analyzing § 843(b), its companion guideline, U.S.S.G. § 2D1.6, and the case-law, I concluded that under the circumstances of this case the offense level should be based on the total amount. However, in determining the final sentence, I considered defendant's status as primarily a user rather than a dealer. I ultimately sentenced defendant to five years probation with various conditions, including 180 days of home confinement. This memorandum contains written

reasons for the sentence.

## I. SENTENCING PROCEDURE

In imposing sentence, the district court follows a two-step process. The court must first resolve disputed factual issues, determine relevant conduct by a preponderance of the evidence, and apply the appropriate sentence enhancements in order to compute the advisory sentencing guideline range. United States v. Robinson, 435 F.3d 699, 701 (7th Cir. 2006). Then, to ascertain the actual sentence, the court must apply the criteria set forth in 18 U.S.C. § 3553(a) to the facts and circumstances of the defendant's particular case. See United States v. Bush, 523 F.3d 727, 729 (7th Cir. 2008).

## II. DISCUSSION

**A. Guidelines/PSR Objection**

The PSR adopted a base offense level of 18 under U.S.S.G. § 2D1.1(c)(11). The PSR based the level primarily on defendant's post-arrest statement, during which he admitted that he obtained about 200 grams of cocaine from Aguilera between April or May and August 2006.[1] He indicated that most of the cocaine was for his own personal use, but admitted that he sold some of it to friends and associates. Because defendant's statement was consistent with the recorded calls and Aguilera's later debrief, and was made against his penal interest, I found it sufficiently reliable to judge the total amount of cocaine involved. See U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of

---

[1] Specifically, defendant stated that on five occasions he purchased $1/16$ ounce; on five occasions he obtained $1/8$ ounce; on fifteen occasions $1/4$ ounce; and on four or five occasions ½ ounce.

2

evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."). I therefore found that the government had shown by a preponderance of the evidence that defendant obtained a total of 100 to 200 grams. See, e.g., United States v. Rollins, 544 F.3d 820, 838 (7th Cir. 2008) ("The government must prove the amount of drugs attributable to a defendant by a preponderance of the evidence.").

Under U.S.S.G. § 2D1.6, in determining the offense level for a violation of 21 U.S.C. § 843(b) the court is instructed to use the offense level applicable to the underlying offense, that is, the offense the defendant facilitated by his use of the telephone. In the present case, I found that the underlying offense defendant facilitated was, most immediately, Javier Aguilera's distribution of cocaine (to him) on July 14, 2006.[2] As indicated above, defendant obtained cocaine from Aguilera on other occasions, and pursuant to the wiretap the government intercepted nineteen drug related calls between the two in the summer of 2006. The record showed that these additional purchases were part of the same course of conduct as the July 14, 2006 transaction. See U.S.S.G. § 1B1.3(a)(2). I also noted that Aguilera had been charged with and pleaded guilty to conspiracy to distribute cocaine based on his course of dealings with defendant and others. Under U.S.S.G. § 2D1.1(c), drug distribution offenses involving 100 to 200 grams of cocaine carry a base offense level of 18.

But defendant objected to base level 18, arguing that amounts he purchased for personal use should not be counted. He relied upon United States v. Wyss, 147 F.3d 631,

---

[2]The specific offense of conviction pertained to a July 14, 2006 phone call during which defendant ordered $1/_8$ ounce of cocaine from Aguilera. The information to which defendant pleaded guilty alleged that the call facilitated "the attempted distribution and possession with intent to distribute a controlled substance." (R. 481.) However, under the facts presented, it appeared that the offense defendant facilitated was Aguilera's distribution of cocaine to him, not his own offense of acquiring cocaine (from Aguilera) with intent to distribute it to others.

3

632-33 (7th Cir. 1998), in which the court held, in a possession with intent to distribute case, that drugs the defendant obtained for personal use should be excluded from the guideline calculation. The court noted that personal use amounts could not be considered part of the same course of conduct, or common scheme or plan, as the offense of conviction under U.S.S.G. § 1B1.3(a)(2), and therefore could not be grouped under § 3D1.2(d). The court also noted that it made little sense to treat someone who possessed 1 kilogram with intent to distribute all of it the same as one who possessed the same amount with the intent to distribute only half; as a matter of common sense, the first offender was the more dangerous criminal. Id. at 632.

However, the Wyss court distinguished conspiracy cases from possession with intent to distribute cases. In the former, the court said, it made no difference whether the defendant bought drugs for his own use or for resale; the amount involved in the conspiracy was unaffected. Id. The same appeared to be true in this context. The amount involved in the underlying offense defendant facilitated – directly, Javier Aguilera's distribution of cocaine to him – was unaffected by what defendant later did with the cocaine. As the court explained in United States v. Kozinski, 16 F.3d 795, 807 (7th Cir. 1994):

> Distributing cocaine is felony under . . . 21 U.S.C. § 841. The appellants were charged with using the telephone to facilitate that distribution. If, by their use of the telephone, the appellants have made the distribution of the cocaine easier, they have facilitated it and violated the statute. United States v. Binkley, 903 F.2d 1130, 1135-36 (7th Cir. 1990). What they do with the cocaine after it is distributed is irrelevant to whether they facilitated the distribution; the crime is complete long before they either use or dispose of the cocaine. The "subsequent treatment of the cocaine cannot retroactively diminish [the] previous facilitation of [the distribution]." Id. at 1136. Under the clear terms of the statute a person who uses a telephone to assist the distribution of cocaine, and then consumes the cocaine is as culpable as the one who uses the telephone to assist the distribution, and then gives the cocaine to another to consume.

4

I acknowledged that Kozinski addressed liability under § 843(b), but the logic of the case seemed to extend to sentencing under U.S.S.G. § 2D1.6, which looks to the underlying offense.[3]

Further, as noted above, Javier Aguilera pleaded guilty to a conspiracy charge under 21 U.S.C. § 846, and the PSR indicated that defendant dealt with other conspirators on at least a few occasions when Aguilera was unavailable.[4] Wyss exempts conspiracy cases from the personal use rule. Had I considered the underlying offense defendant facilitated by his use of the phone to be the Aguilera conspiracy, then Wyss simply did not apply. As the Seventh Circuit explained in United States v. Snook, 60 F.3d 394, 396 (7th Cir. 1995), where the personal-use cocaine influences the size and scope of the conspiracy, such amounts may be included.[5]

---

[3]I also acknowledged that the Supreme Court recently granted certiorari to decide whether § 843(b) covers use of the phone to obtain drugs for personal use, Abuelhawa v. United States, No. 08-192, 2008 WL 3849383 (U.S. Nov. 14, 2008), but as indicated in the text, the Seventh Circuit has long construed the statute to cover such conduct, and defendant conceded that his use of the phone in this case violated the statute.

[4]Defendant stated without contradiction that he included the amounts he obtained from these others acting on Aguilera's behalf in his estimate of the total amount of cocaine involved.

[5]Defendant argued that Snook was inapposite because he was not convicted of conspiracy, but rather of using a telephone to facilitate the attempted distribution and possession with intent to distribute cocaine. However, as explained in the text, there appears to be a difference between § 843(b) offenses, and possession with intent to distribute offenses under § 841(a)(1). Defendant also cited several other cases in which the court excluded personal use amounts under U.S.S.G. § 2D1.1(c). However, like Wyss, the cases adopting this rule typically involve possession with intent to distribute offenses, not conspiracies or § 843(b) offenses. See, e.g., Jansen v. United States, 369 F.3d 237, 247 (3d Cir. 2004) (holding "that mere possession of a drug for personal use is not part of the same course of conduct or common scheme as the offense of possession with intent to distribute drugs"); United States v. Gill, 348 F.3d 147, 156 (6th Cir. 2003) ("We hold, therefore, that simple possession of illegal drugs for personal use is not conduct that is 'relevant' to the charge of possession with intent to distribute a controlled substance for the purpose of determining a sentence range under the

5

Therefore, I found that, as a matter of guideline interpretation, it was appropriate under the circumstances of this case to set a drug weight of 100-200 grams and a base level of 18. After subtracting 3 levels for acceptance of responsibility, § 3E1.1, I adopted a final offense level of 15, which, coupled with defendant's criminal history category of III, produced an imprisonment range of 24-30 months.

However, in considering the severity of the offense and the need to provide just punishment under § 3553(a), I found it appropriate to determine whether defendant was, as he said, primarily a user rather than a dealer. See Fed. R. Crim. 32(i)(3)(B) (directing the district court to rule on any disputed portion of the PSR that may affect the sentence). As the court suggested in Wyss, one motivated to participate in drug-related activity based on his own drug use is less culpable than one who participates with the primary intent of distributing to others. Wyss, 147 F.3d an 632; see also United States v. Knox, No. 07-CR-123, 2008 WL 4682660, at *2 (E.D. Wis. Oct. 21, 2008) (imposing a below-guideline sentence where the defendant was primarily a user rather than a dealer).

The record supported defendant's assertion that most of the cocaine he obtained was for personal use. The government presented no evidence of how much cocaine defendant dealt or shared; nor did it identify defendant's putative customers; nor did the recorded calls contain any discussion of re-distribution. The government instead relied on the total amount

---

Sentencing Guidelines."); United States v. Williams, 247 F.3d 353, 358 (2d Cir. 2001) ("Where, instead, there is no conspiracy at issue, the act of setting aside narcotics for personal consumption is not only not a part of a scheme or plan to distribute these drugs, it is actually exclusive of any plan to distribute them."). Therefore, I found these cases distinguishable.

6

involved and questioned whether defendant could have consumed as much as he claimed.[6] As noted above, defendant's post-arrest statement was consistent with the recorded calls and with Aguilera's characterization of defendant as a user; therefore, I found the statement to present a credible and reliable source of information on what defendant did with the cocaine he obtained.[7]

In the statement, defendant said that he used up to $1/8$ and at times $3/16$ ounce per day. Defendant regularly dealt with Aguilera for about four months. If he used even $1/16$ ounce (1.77 grams) per day during that time, he would have consumed over 200 grams of cocaine. I therefore found that for purposes of considering defendant's culpability under § 3553(a), most of the cocaine defendant obtained was for personal use.[8]

---

[6]During an earlier suppression hearing in this case, the lead case agent testified that the amounts defendant obtained were generally consistent with heavy personal use.

[7]Wyss suggests that, although the government bears the burden of proving drug weight, when the defendant claims that the amount should be reduced based on personal use it may be appropriate that he bear some burden of producing evidence to support his assertion. 147 F.3d at 633; see also Gill, 348 F.3d at 156 (holding that "the defendant bears the burden of production with respect to his personal use of the drug in question"). Because the facts supporting a personal use claim would ordinarily lie peculiarly within the knowledge of the defendant, such a rule would seem to make sense. Cf. Dixon v. United States, 548 U.S. 1, 8-9 (2006) (adopting the common law rule that the proponent of an affirmative defense bears the burden of proof); U.S.S.G. § 2D1.1(b)(1) & cmt. n.3 (shifting to the defendant the burden of proving that it was clearly improbable that a weapon he possessed was connected with his drug offense). I did not formally shift the burden of production or persuasion in this case. Nevertheless, I found defendant's statement sufficiently reliable to support his contention on this issue.

[8]Defendant stated that his best estimate of the amount he distributed was 20 to 40 grams. Under the circumstances, I did not find it necessary to find a precise amount; it was sufficient to conclude that the vast majority of the cocaine defendant obtained was for personal use.

7

**B.     Sentence**

**1.     Section 3553(a) Factors**

In imposing the ultimate sentence, the court must consider all of the factors set forth in § 3553(a):

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the advisory guideline range;

(5)  any pertinent policy statements issued by the Sentencing Commission;

(6)  the need to avoid unwarranted sentence disparities; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The statute directs the court, after considering these factors, to impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing set forth in § 3553(a)(2). This so-called "parsimony provision" represents the "overarching" command of the statute. <u>Kimbrough v. United States</u>, 128 S. Ct. 558, 570 (2007).

The district court must give respectful consideration to the guidelines in determining a

8

sufficient sentence, Gall v. United States, 128 S. Ct. 586, 594 (2007), but it may not presume that the guideline sentence is the correct one, Rita v. United States, 127 S. Ct. 2456, 2465 (2007), or place "any thumb on the scale favoring a guideline sentence," United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007). The guidelines "are but one factor among those listed in 18 U.S.C. § 3553(a)," United States v. Carter, 530 F.3d 565, 578 (7th Cir.), cert. denied, 77 U.S.L.W. 3242 (U.S. 2008), and "§ 3553(a)(3) directs the judge to consider sentences other than imprisonment," Gall, 128 S. Ct. at 602.

### 2. Analysis

#### a. The Offense

This prosecution arose out of the government's investigation of a large-scale cocaine distribution organization in the Waukesha, Wisconsin area, headed by Javier Aguilera, which, as noted, included several wiretaps. The government intercepted numerous drug-related calls between defendant and Aguilera, which revealed that Aguilera supplied defendant with small amounts of cocaine. On one occasion, Aguilera also asked defendant to test the quality of cocaine he had purchased.

As discussed above, in his post-arrest statement defendant indicated that he met Aguilera in the spring of 2006 and shortly thereafter began obtaining cocaine from him, in amounts ranging from $1/16$ to ½ ounce. Defendant stated that during this time he had a severe cocaine habit, using $1/8$ to $3/16$ ounce daily. In his version of the offense, defendant reiterated his heavy cocaine use in the summer of 2006, which increased after his girlfriend's son died in July. Defendant acknowledged that he sold some of the cocaine he obtained from Aguilera to friends and associates, but he characterized the arrangements as joint purchases in which

9

friends reimbursed him for cocaine he shared with them while partying.

### b. The Defendant

Defendant was twenty-four years old, with a modest prior record: a carrying a concealed weapon[9] and marijuana possession case from 2002, when he was seventeen; a resisting an officer case in 2004; and drunk driving and bail jumping in 2005. He was on probation for the bail jumping case when he committed the instant offense, which resulted in revocation and imposition of a 6 month jail term. He also had a pending drunk driving case, which he picked up during the pendency of this case.

Defendant appeared to have had a decent childhood, but he started drinking and smoking marijuana in his teens, then started getting into trouble with the law, as set forth above. Defendant reported heavy alcohol use starting in high school, continuing until August 2008. He admitted smoking marijuana every day while in high school,[10] which continued until his arrest in this case in December 2006. He started using cocaine at age sixteen, which also continued until his arrest in this case.

However, defendant appeared to be doing much better lately. All sixty-two of his drug screens on pre-trial release were negative. Although he initially denied the need for treatment, following his drunk driving arrest in August 2008 he pursued treatment at the Lawrence Center, completing an intensive out-patient program. As part of his pre-trial release conditions, defendant was tested for alcohol use daily after the drunk driving arrest, with negative results. He attended group meetings three times per week at the Lawrence Center, as well as weekly

---

[9]The CCW case involved a knife, not a firearm.

[10]Somehow, he managed to graduate.

10

individual sessions. His counselor wrote that he had been actively involved in the group and gained insight into his addictions, completing the intensive portion of the program and moving into aftercare. The counselor indicated that defendant was on track to meet all treatment goals, and his prognosis was good. Defendant also complied with the conditions set in the pending drunk driving case.

Defendant maintained a solid employment record, working as an assistant manager at a restaurant for the past seven years. His employer provided a letter indicating that he was an exceptional worker. I found significant the fact that defendant, while managing money at the restaurant, never stuck his hand in the till despite his severe drug problem. I also received positive letters from defendant's parents, who indicated that unlike previous occasions he seemed to now be embracing treatment; his girlfriend of three years, who likewise attested to his progress in treatment; and two of his aunts, who spoke of his positive personal qualities.

### c. Guidelines and Purposes of Sentencing

The guidelines called for a term of 24-30 months, but defendant asked for probation with a condition of home confinement under § 3553(a). I found such a sentence sufficient to satisfy the purposes of sentencing.

First, given the fact that defendant was primarily a user rather than a dealer, I found that prison was not necessary to provide just punishment. See 18 U.S.C. § 3553(a)(2)(A). A sentence that treated him the same as a dealer of the same amount of cocaine would have been greater than necessary. See Wyss, 147 F.3d at 632. To the extent that defendant did provide cocaine to others, it was in the context of sharing with friends with whom he had pooled money. He was not a dealer in any meaningful way. Aside from once testing cocaine for Aguilera, he did nothing more to further the underlying conspiracy. I also took into account the

11

fact that defendant served 6 months in jail after his probation was revoked based on the instant offense conduct.[11] A further period of home detention provided a sufficient additional measure of punishment, along with needed structure.

Second, I found a sentence served in the community sufficient to protect the public. See 18 U.S.C. § 3553(a)(2)(C). Defendant's record consisted of minor offenses indicative of a substance abuser; he had no history of violence, theft or predatory conduct. If able to keep his substance abuse under control, which he seemed well on his way to doing, I found him unlikely to re-offend. Likewise, a period of close supervision provided sufficient deterrence. See 18 U.S.C. § 3553(a)(2)(B). Upon violation of any of his conditions, defendant faced revocation and a sentence to the full punishment originally available, up to 4 years in prison. See 18 U.S.C. § 3565(a)(2) (providing that on revocation of probation, the court re-sentences the defendant under § 3553). I also took into account defendant's cooperation with authorities on his arrest, providing a full statement of his dealings.[12]

Finally, I found that a sentence served in the community best satisfied the need to provide necessary treatment. See 18 U.S.C. § 3553(a)(2)(D). I noted that I could place defendant on probation (with conditions requiring continued treatment) for up to five years, see 18 U.S.C. § 3561(c)(1), while supervised release was in this case limited to one year, see 18 U.S.C. § 3583(b)(3). The longer term better served both the needs of the public and defendant's treatment needs.

---

[11]It appeared likely that, because defendant was originally charged in a 5 kilogram cocaine conspiracy in this case, the state court judge imposed a longer revocation sentence than he otherwise might have.

[12]Absent that statement, it seems unlikely the government could have shown that defendant ever distributed cocaine to others, in any amount.

12

## III.  CONCLUSION

While defendant avoided prison in this case, his sentence constituted much more than a slap on the wrist.  As the Supreme Court explained in Gall:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.  Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.

128 S. Ct at 595-96 (internal citations and footnote omitted).

In the present case, in addition to the standard conditions, I ordered defendant to participate in drug testing and treatment, with the probation office authorized to conduct up to six random tests per month; to consume no alcohol and to avoid taverns or other establishments where alcohol was the principal item of sale; to participate in the cognitive intervention program at the direction of the probation officer; to perform twenty hours of community service work per year, in lieu of a fine, for a total of 100 hours; and, finally, to serve 180 days of home confinement on electronic monitoring.  These conditions represented a substantial limitation on defendant's freedom and served to fully satisfy all of the purposes of sentencing.

This sentence was based on my evaluation of the § 3553(a) factors and would have been the same regardless of my finding on the disputed guideline issue.  The sentence varied from the guideline range I adopted, but because it was based on the specific facts of the case

13

discussed herein, it created no unwarranted disparity.  See 18 U.S.C. § 3553(a)(6).

Dated at Milwaukee, Wisconsin, this 20th day of November, 2008.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge